Good morning. I'm Thomas Axelson, Counsel for Joseph J. Janas, the Bankruptcy Trustee. For the record, my co-counsel, Thomas Caishonal, is also present this morning. Thank you. This case is about one of the primary purposes of the Bankruptcy Code, that is to achieve an equality of distribution among similarly situated creditors. In this particular case, the issue is whether a single creditor of an insolvent contractor should be paid in full, while other creditors are not. The creditor was Reuter Equipment Company. The insolvent contractor was JWJ Contracting. I represent the trustee of JWJ Contracting. The trustee filed his complaint to avoid three preferential transfers that Reuter received. Two years of discovery ensued. Reuter then filed a motion for summary judgment. The trustee filed a cross-motion for summary judgment. The bankruptcy court entered summary judgment in favor of the trustee avoiding the three preferential transfers. In effect, what the bankruptcy judge did was require Reuter to disgorge those payments that it received, pay it back to the estate, so that Reuter would then share equally with the other creditors of the bankruptcy estate. So I think it's significant to note that we're not suggesting that Reuter should receive nothing. We're only suggesting that Reuter share equally with the other creditors of the estate. That's consistent with the primary purpose of the bankruptcy code. Now, Reuter appealed the bankruptcy court's judgment to the district court, which reversed. The trustee, in turn, appealed to this court. The trustee is asking this court to affirm the decision of the bankruptcy court and vacate the decision of the district court. The trustee submits the bankruptcy court's decision as correct in all respects. Counsel, would you please explain why these payments did not fit within the contemporaneous exchange exception? Yes. First, I should note that Reuter has raised a new issue on appeal concerning the contemporaneous exchange exception. What Reuter is arguing for the first time to this court is that Reuter had a lien against unpaid contract proceeds that remained in the possession of the project owner. It may be beneficial for me to clarify what contract proceeds were talking about. I guess the question I had, your whole argument about that they don't meet the preference requirements and 547B and this new lien theory wasn't presented to either the bankruptcy court or the district court. And I am having some trouble trying to justify why we should look at it for the first time on appeal. The trustee agrees entirely. There's two different issues that I've been asked about now, the contemporaneous exchange exception as well as the 547B5 element. Right, but you have in both of those, you have sort of aspects of not having raised them before, correct? Well, certainly the trustee raised the 547B5 element and indeed made a sufficient showing on that element. We concede that it was the trustee's burden to make a sufficient showing on a motion for summary judgment that the 547B5 element was satisfied and the trustee did in fact make that sufficient showing. And in fact, that was never an issue before the bankruptcy court. If you look at Reuter's initial motion for summary judgment, if you look at their response to the trustee's cross motion, if you look at their reply, and if you look at the transcript of the oral argument, Reuter never disputed that the trustee had satisfied the 547B5 element. Right, now they raise it. But you also are raising a whole new issue, correct, under the lien theory as a subsidiary to the contemporaneous exchange argument? That is not a new issue being raised by the trustee. This is a new issue that's being raised by Reuter. Okay. And we would entirely agree with the court that these are new issues being raised for the first time on appeal. And there are many Ninth Circuit cases, as this court is aware, that absent extraordinary circumstances, those new issues should not be considered for the first time before this court. Also, if it's an issue of law and the record is sufficiently complete that we can resolve the issue, you wouldn't argue that the court cannot resolve that issue, would you? Your Honor, I would argue that if the issue is not raised before the bankruptcy court, it should not be addressed by this court on appeal absent extraordinary circumstances. And here these arguments Our case authority that says we can affirm on any basis finding support in the record, even if it's a different basis than that relied upon by the district court, what about that line of authority? I am aware of the case law that you're referring to. And the only way I've been able to reconcile it with the other cases that have been cited in our brief is the fact that the argument must still be raised before the trial court, which in this case was the bankruptcy court. If it's not raised, I don't think it's appropriate absent extraordinary circumstances. If it's just a purely legal issue, it's your view that we should not address it, even if it's just a purely legal issue that we are resolving the case on? Certainly, if it was not raised. I'll go back to the contemporaneous exchange exemption or exception. Why in your view doesn't that answer the question here? The first new argument that's being advanced by Reuter before this court on this very exception is that Reuter contends it had a lien on these unpaid contract proceeds in the hands of the state of Arizona at the time these transfers were made. And it's helpful to clarify what contract proceeds we're talking about here. JWJ was a contractor. It had a contract with the Arizona Department of Transportation, also known as ADOT, to construct these public highways. ADOT had unpaid proceeds that it had not yet paid to JWJ. At least that's what's being argued by Reuter. Reuter is saying because Reuter had a lien against those proceeds in the hands of the Arizona Department of Transportation, when it got paid, Reuter released that lien. And that is a contemporaneous exchange for new value, the new value being the release of the lien. The fatal flaw there in that argument, though. I'm not sure so much the release of the lien as much as the surety's interest is a little different. Actually, under Figert, I think that's the correct analysis. But why shouldn't we? And so I look at Figert and I say, well, that looks like this case. Tell me why not. Well, first of all, I think Figert requires the court to engage in at least a five-step analysis. And perhaps the very first step in the five-step analysis is were there unpaid contract proceeds remaining payable on the date of these transfers? That is a factual issue that was waived by Reuter before the bankruptcy court. Well, I'm wondering, is the waiver argument based on the one statement in effect where they say, well, I don't think it's an issue here? Is that the waiver? Well, it's based on not only that, but the questions that the bankruptcy court was asking. The bankruptcy court was well aware of the Figert case and the Figert analysis and was specifically inquiring of Reuter's counsel at oral argument if the Figert analysis applied here. And the first step in the analysis is, you know, are there contract proceeds remaining payable? Reuter waived the issue before the court. But the trustee would submit that even if this court looks beyond the waiver, there are still at least four additional essential elements to that defense on which Reuter presented absolutely no evidence whatsoever. And Reuter had the statutory burden under Section 547G to make a sufficient showing of all of these elements. One of the most important elements, which there is no evidence to support in the record, is that the contract proceeds were actually given by ADOT to the debtor in exchange for the transfers from the debtor to Reuter. But that's not under the – you pronounce it Figert, is that? I have pronounced it Figert. That's fine. I'll take your pronunciation. I just read it. I don't pronounce it usually. So in the Figert case, though, I thought that was exactly the point, is that the proceeds – I don't know whether they went to the debtor, but whether, in fact, the new value was basically the secured creditor's release. And that's the situation you have here. It wasn't that, you know, the proceeds don't go to the debtor, which is sort of your argument. So I thought that case really was precisely what we had here on that point about whether the debtor actually needs to get the proceeds. Well, in the Figert case, significantly, proceeds were given to the debtor. If you look at the bankruptcy appellate panel's decision, we believe it clarified that the debtor did actually receive payments in excess of the preferential payments that issue from the governmental entity. So we think Figert is distinguishable, and that's probably the reason why the Ninth Circuit in Figert did not expressly focus on this given-to-the-debtor requirement. Counsel, your view is that if there are proceeds that remain on hold for payment, that's not sufficient to satisfy the Figert rationale? Well, I think it's certainly the necessary first step. Those proceeds have to be there in order to go to the next step in the Figert analysis, which is were those proceeds given to the debtor. In the Powerine decision, the Ninth Circuit clarified that the fundamental inquiry in determining whether the contemporaneous exchange exception applies is whether there's a diminution of the estate. And so what we're talking about here is when the debtor makes transfers to Reuter, the preferential transfers in this case, the estate is diminished unless there is a corresponding amount of contract proceeds given to the debtor that replenishes the estate, and that is fundamentally what is missing here. There is a diminution of the estate because proceeds went out of the estate to Reuter, and there's no evidence that anything came in. So you don't buy the argument that because the surety would have less liability for nonperformance, that that constitutes new value? You don't buy that argument? Well, I think what's significant about this case is the surety was substantially undersecured. In other words, the surety's obligations were substantially more than the contract proceeds that were remaining. That's another question I have, so I'm glad you went there. I was trying to figure that out. At the time of the transfers, what's the evidence of the undersecured status? Well, there is certainly evidence in the record of the losses that the surety sustained in completing these projects. See, that was my problem, is that everybody says, well, down the road there's this shortfall. But that's not at the time of transfer. And we would agree that the relevant time of inquiry is the time of transfer. Okay. So let's start with that. If we look at the time of transfer, what evidence do we look to in the record to establish the undersecurity or the shortfall? I'm not sure that it's necessary or whether it's an ‑‑ I don't believe the correct issue is whether the surety was experiencing a loss at the time of the transfer. I think the correct analysis in the issue to be addressed is was new value given to the debtor at the time of the transfer? In response to my question, you said that the surety was undersecured. So I guess it would be important to us to know what evidence you rely upon in the record to support that assertion. And I think you say that because you say the release of the lien or the release of the surety's interest can't be the new value because they're undersecured. So it all ties back to your point about why there's no new value, doesn't it? Our position is that the only reason it is relevant to look at whether the surety ultimately sustained a loss is because it demonstrates the importance of the given to the debtor requirement that is set forth expressly in the statute. If the contract proceeds are not given to the debtor at substantially the same time as the debtor makes these transfers to Reuter, the proceeds in the hands of the government may never go to the estate. And, in fact, that's what happened in this case because the surety ultimately sustained losses and the court ordered that all of those proceeds go to the surety. So the only reason we're bringing up the losses that the surety ultimately sustained is because it really demonstrates the importance of the given to the debtor requirement that's set out in the statute. If it's not given to the debtor, it may never go to the debtor for a variety of reasons, including the surety's ultimate loss, and the net effect is the estate is diminished. The terms of the statute, 547C1A, expressly use the given to the debtor language. It has to be given to the debtor, and the Ninth Circuit has consistently interpreted that literally. In the Grand Chevrolet decision, New Corp Energy and in Bullion Reserve. And the illustration that I think best shows the flaw in Reuter's argument is the following. Assume the government has $2,000 in unpaid proceeds remaining payable, yet the debtor has 10 subcontractors each contending they're owed $1,000. Under Reuter's theory, each one of those 10 contractors can get paid and say we're protected because there was $2,000 in contract proceeds remaining. And the net effect is the estate's been diminished by $8,000 because there's only $2,000 in proceeds, yet these 10 subcontractors have received $10,000 in payments. There's an $8,000 diminution there. But then it would have to be contemporaneous so that you wouldn't have new value going to the contractor at that time. You'd have negative value. You'd have minus 8. So I'm not sure how that hypothetical gets us down the road that you want, because if you gave me that hypothetical, I'd say, well, there's not sufficient new value to cover the claims. And, therefore, you don't get relief as the subcontractor or the third party under the 547C exception. Yet each of those 10 subcontractors in the hypothetical would make the same argument Reuter is making here, which is that, hey, they'd all be making it at the same time, and so you'd have to amalgamate those on that particular date of, quote, transfer or new value, wouldn't you? I think the proper way that the statute should be interpreted and applied is that the contract proceeds actually have to be given to the debtor. In other words, they've got to go into the bank account or the pocket would be your view. I'm sorry? I said, in other words, given means going to your bank account or going to your pocket and actual transfer. I think it does have to actually be transferred from the project owner, which in this case was ADOT, to the debtor. And I think if this court gets past all the waiver issues, which I think are compelling arguments, and says, well, let's just assume that the waivers are not an issue and there were some contract proceeds there, is that enough? And we would submit that it's not. Counsel, how do you square that with our holding in Figert that said that security interest release constitutes new value? How do you square your position with that holding? Because in Figert when the ‑‑ it was undisputed that the proceeds that were released from the surety's contingent equitable lien went to the debtor. And that's what we're saying was clear from the bankruptcy appellate panel's decision. Proceeds went from the project owner to the debtor in that case. And perhaps the issue was not raised or focused upon because it was a different factual scenario. Here there is no evidence that any proceeds went to the debtor. And, in fact, if we look at the broader picture, we can see why it is so important that that requirement be literally construed. Because if not, all these proceeds were, as in this case, ordered paid to the surety. And lastly, just to sum up, because I see my time is about to expire, it was Reuter's burden to show that there were contract proceeds remaining. And they didn't. The trustee didn't have to present any evidence on that. Reuter presented no evidence. And for that reason, I think this whole issue goes away on the Figert analysis. Counsel, maybe I'm misreading Figert, but I thought in that case the payments went to creditors of Figert's or went to suppliers of Figert's as opposed to Figert itself. Well, just as in this case there were two sets of transfers, the preferential transfers at issue were when Figert made some payments to its suppliers. From the proceeds of the contract. Well, from, I'm not sure it's clear. It made transfers, whether it was from its own unencumbered funds, its own bank account, or whether it was some funds that were traced to this project in the hands of the project owner. Could you just read the language to me in Figert that you rely upon for your assertion that the proceeds must go to the debtor? Because I'm not clear about where that language comes from in Figert. I'll do that. Thank you. Good morning, Judge McEwen, Judge Rawlinson. May it please the Court. My name is John Doody, and I represent Reuter Equipment Company, and I'm here to discuss the Figert case. So my pronunciations are totally different from everybody else's, but hopefully we're talking about the same case. I just want to go right to a point that the Court is focused on and Mr. Axelson is focused on, and maybe even anticipate a question. Mr. and Judge Rawlinson was just focusing on this. The judge said, where does it say in Figert that the funds that are released from the mechanics lien or strike that from the equitable lien have to go to the debtor? It doesn't say that anywhere in Figert. Mr. Axelson is not going to be able to show that to the Court. I would like to direct the Court to, and this is something I think is a misunderstanding on the part of the trustee as to the statutory scheme. I'd like to direct the Court's attention to the definition of new value in Code Section 547A, Subsection 2, which talks about the standard new value, meaning money or money's worth in goods, services, or new credit. But it also says, quote, or released by a transferee of property, that would, in this case, be Reuter, under the equitable lien theory, that property, those contract proceeds, were transferred to Reuter in a transaction that was not subject to being made void or voidable by the trustee. That's an automatic, as a matter of law, state law consequence. That releasing that transfer, in other words, from Reuter back to the debtor, releasing that property in and of itself is enough of a transfer to be considered new value, whether or not the money actually goes into the debtor's pocket. If it's released for the use of the debtor, which no one claims otherwise, in this case it clearly was, because at the time the payment was made, there were more than sufficient proceeds on the subject jobs. There were much higher value than the amounts of the payments made to Reuter at the time the payments were made. This estate wasn't diminished, therefore, by the payments to Reuter. It was diminished by things that happened afterward. And that's why the code, Section 547, both 547B, which is the Chapter 7 equivalency, focusing on whether or not there were sufficient contract funds to secure Reuter's lien at the time the bankruptcy was filed, which was not Reuter's burden, it was the trustee's burden, and the only trustee evidence on that was the trustee's conclusory affidavit, saying that I think there would have been a Chapter 7 equivalency. That's not evidence of anything. And there's also the same focus on this contemporaneous exchange of value at the time the payment was made, which was earlier than the bankruptcy was filed, obviously, because we're here on a preference matter, that focuses on that particular time. It does not focus on whether or not, after all the dust settled two or three years later, in a huge, this was an extremely complex bankruptcy that's been going on since 1994, involving hundreds of millions or tens of millions of dollars, maybe even hundreds of millions of dollars, and about 20 jobs, I believe, 20 construction, this was a huge contractor that went bankruptcy. Is the trustee suggesting that creditors like Reuter should take the risk that at the end of a job, at the end of a bankruptcy like that, that all these jobs are going to come out solvent, that there's going to be plenty of money to pay everybody? That's not a risk that Reuter should be reasonably expected to take. The trustee makes because the policy of the law under 547C1, which is the exception that we're talking about according to In Re Lee, which is a Ninth Circuit case, is to encourage creditors to continue to do business with a troubled debtor so that they won't all abandon the debtor and make it more certain that the debtor will go into bankruptcy. It's true that there's an overarching purpose in the bankruptcy law to treat creditors the same. But that's why there's an exception in the preference law in situations like this where new value is actually being given so that creditors like Reuter aren't being asked to take the risk, to roll the dice, that at the end of the day, and the end of the day can be four years later perhaps, that all these projects are going to come out having made money. That's not a risk we should take. Would you please address the waiver arguments both on the preference and on the contemporaneous exchange? Yes, Your Honor. A waiver, my understanding of waiver has always been that it's a matter of intent. It's not something that you can just be defaulted. Forfeiture. Pardon me? We always say waiver. We say it in our cases. We mean forfeiture. That's a really strong word. That's an industrial strength word in the law. And so you've got to have the intent to waive. It's got to be something knowing, yes, I'm waiving it. Fine. I can see it's a concession. And that's a question of fact. And the only evidence that the trustee introduces on that subject is the statement of another attorney, who, by the way, wasn't yours truly, I might add. Right. It was somebody else. Not my fault. Okay. But I will take responsibility to the extent that it was, that I was on earth at that time. You know, the only evidence. Are you discussing the preference for the contemporaneous exchange? I think there were two separate arguments on the preference issue. My recollection was that everybody proceeded as if there was a preference and you went to the exception argument. So would you address that first? Yes, Your Honor. The first one is that this is a Chapter 7 equivalency argument. That's, you know, the threshold issue that the bankruptcy has to prove. The court is now focusing on that, saying, wait a minute, first of all, if there's a preference, that's fine. Then you go to whether or not there's an exception. But everyone seems to have been operating under the supposition that there was a preference. And it sure seems that way when you read the briefs. And I don't disagree with that. Was there any challenge made to the fact that the transfers were preferential? Yes, Your Honor, there was. And where was that? I'll direct the court specifically to that. In the motion, let's see. I have that, Your Honor. Let's see. This is a. If you can't find it now, let me suggest this. I'm getting flustered. We have supplemental authority, pieces of paper. Thank you. You can write down the citation provided to the other counsel and give a copy to the court. I'm going to point the court to where this is. This is in the summary judgment. In the summary judgment papers, I believe, there was a statement of facts. That's what it was. Statement of facts. The trustee's statement of facts on his cross motion. Statement of fact number 10. You're talking about the Vaughn affidavit now, right? No, no. No, you're not. I'm talking about a pleading that said this was not a preference. Okay. That's enough, I think. You know, it may not be overwhelming authority. It may not be really persuasive. But they took the position that this was not a preference. Trustee's statement of facts number 10. I'm doing this from memory, but I'm pretty sure it's right. I just looked at it. I don't know what tab that was, but it was their statement of fact number 10. Ruder, in its statement of fact response. It is not a preference? No, the trustee said it was. This is the trustee's statement of fact where they took the position that it was a preference. When Ruder responded to that in their statement of facts against the trustee number 10, they disputed it. And I'm not going to mislead the court into saying they disputed it on the same argument that I'm making. It's unclear. But what I do say is at least they did not concede that this was a preference. So that's my answer to the first question that you've raised, Judge Rawlinson. The second question is whether or not really the Faggard argument was raised. I mean, basically it was raised. It was raised in the ‑‑ and this one I do actually have open. This is in Ruder Equipment Company's motion for summary judgment. This is record tab 16. And I'd like to direct the court to page 712. And starting in lines, well, basically line one through the whole page, really going on to the next couple of pages. I mean, this is ‑‑ it cites Faggard. It says, let me just quote, each check released Ruder's rights. This is, I think, I wouldn't have phrased it this way, but this is how they did it. Each check released Ruder's rights against the payment bond to the extent of payments made. This, in turn, eliminated continental. That's the charity's equitable lien, potentially assertable against JWJ in the event continental was called upon to remedy JWJ's default. That's what we're talking about here. That is the Section 547c1 exception. No question. If that argument was made, and if we accept that the Vaughn Affidavit, which was attached to the trustee's statement, is in the record, the question I had in looking at the Vaughn Affidavit is, it seems to be that this accountant chart was prepared in 1995, and then there's one period where the accountant chart talks about the time of bankruptcy through May of 1995. So I guess the question I have is, is that evidence of sufficient proceeds in the account at the time of the transfers, which are a whole different date? Right, but if it was a later date, I would agree that's a problem. Because if there's money in 1990, and then in 1995 there's a transfer made, we don't know whether that's not the fact that there was money in 1990 doesn't necessarily prove there was money in 1995. But in this case, we've got proof that there was money in 1990 for a job that had been going on. This payment was made before, I shouldn't say, let me just get rid of those hypothetical dates. There was money at the time the bankruptcy was filed, and even a year after the bankruptcy was filed, there was still money, which proves, I think, in the inference. I guess there's an inference, but my question is, is there any possibility that this thing fluctuated such that it dipped down, or are we just kind of to take it on faith that if there was enough money a year later, that it certainly was never any less than that amount? Do you see what I'm saying? I do. And I don't know, Your Honor, I don't know. But, you know, I think the only, and first of all, there's no evidence of any fluctuation. That's clear. There is evidence that there was money there a year after the transfer, much more money than was at these jobs, and that we were supplying them on these jobs. Therefore, the money was going to be available as soon as it was earned, and then the state, ADOT, had to pay the money. So the fund was there because the work was being done. I think the only reasonable inference would be that the money was there at the time the payments were made, although I have to admit it's indirect evidence. But that's the only evidence we have, and that's the only inference that can reasonably, I would submit, be drawn based on the facts that we have in front of us. In other words, I believe that both, to just sum up, I believe both of Judge Rawlinson's questions can be answered in the affirmative. Technically speaking, the ruder did contest the fact that there had, the threshold fact or issue that there was a preference. But then they spent most of their time fighting. Apparently they didn't have their heart in that one as much as they did in the 547C1 argument. But as I was going through this, admittedly, I said, wait a minute, you know, for almost the same reasons that there's no, that there is a contemporaneous exchange of value, you know, within 90 days of the bankruptcy, there's also the same evidence shows that there was no Chapter 7 equivalency at the time the bankruptcy was, that there was a Chapter 7 equivalency at the time the bankruptcy was filed, because we were fully, ruder was fully secured, would have been fully secured at the time the bankruptcy was filed if the transfer hadn't been made because those funds were still there. The argument the trustee is making really is a simple one, and that is you look at the language of the statute, which is the statute says a contemporaneous exchange for new value and then given to the debtor. And that if there's nothing actually given to the debtor, you can think up a lot of theories of equivalencies, but you still don't meet the statute. Why isn't that a good argument since it relies on a pretty clear statute? Well, because the statute also has, Mr. Axelson is just pointing the court to one part of the statute, new value given to the debtor, that's subsection C1A. But I'm also pointing the court to the definition of new value, which is in 547A subsection 2. And that does say, you know, putting the money in his pocket. It doesn't say that, but it more or less says that. Or, quote, or released by a transferee of property previously transferred to such transferee in a transaction that's neither void nor voidable by the debtor or trustee under any applicable law, et cetera, et cetera. That doesn't say put money in the pocket, it says release property and make it available. It doesn't say it has to be put in the trustee's pocket. I mean, you know, really what we're talking about here, again, is whether the policy ‑‑ there can't be ‑‑ Can you go back on that point? Yes, Your Honor. Under A2 definition, the release by the transferee of property, is that release then a Reuters release or a surety release? It's a release by operation of law. By whom? I don't think it matters. Well, no, I think it matters to me. Okay. Because I want to understand it. Okay. So, you know, I don't think we can just say, well, it doesn't really matter. I'm saying in this circumstance, by who is the transferee that is giving the release under that definition? Again, I don't think there has ‑‑ that's a suggestion around an affirmative act of release, like signing a release and giving it over. No, that was an operation of law, extinguishment of a release of a lien that either was possessed by Reuter or by the trustee. Either way, that lien was released by operation of law. I believe it was ‑‑ I believe that the lien was held by Reuter. Well, that's what I'm trying to understand. I know it doesn't have to be like a piece of paper that says I released my lien. Right. That when you extinguish a lien, then by operation of law it can be extinguished. But you think that the transferee that we would refer to in looking at the language is Reuter, not the surety? That's my view of it, Your Honor, because it's true that this is a public works project, kind of like a little Miller Act case where, you know, originally when the bonds were issued, you know, the contractor's substance suppliers, I'll call them, that's us, we have to look to the bond. But before there's a default, and while the project is still going on, which is when we got paid, by the way, the surety had not even been called upon to perform, by the way, when we were getting paid. They were in their office in Philadelphia, wherever they were. You know, they forgot all about this case. Is there liability? Once you're paid, doesn't their liability go down? Their liability does go down. But it was our – we had no – implicit in what the trustee's arguing here is that Reuter should have gone to the surety right away and not taken any money from the debtor during the preference period, as if we knew when they were going to file bankruptcy, because at some point the trustee would say, well, they lost money on the – the surety lost money on the job, therefore you're out of luck five years later. No, that's not the situation here. They hadn't even been called – the surety hadn't even been called upon to perform. We had no obligation to go to that surety to get paid. We had the right to go to the debtor to be paid. And because the surety hadn't been called upon – remember, the surety is subrogated to our lien. That's what Fegert says. That's what Perlman says. That's what General Acrylic says. And they only – that subrogation, I would argue, Your Honor, is not just – it doesn't just require that the trustee place a bond on the project, and therefore we've got to go to them to be paid. It also requires the trustee – the surety to pay in order to be subrogated. The surety never paid anything to Reuter on these claims, and rightly so, because they hadn't even been called upon to perform yet. What the trustee is really doing here, Your Honor, Your Honors, is the trustee wants to get rid of Fegert. The trustee doesn't like Fegert because – and the trustee doesn't particularly like either 547A2, this definition of new value, because what it – because it takes away the trustee's opportunity to disgorge funds that were paid to Reuter. But this is not a question of injustice to the trustee or the unsecured creditors. The equitable lien, equitable lien, is put on to those contract proceeds because we were the ones that helped justify the payment of those contract proceeds by giving our honest labor and our honest materials. We did that. And that's why equity, equitable lien, put that lien on there. It was – this is just that Reuter should have this lien, and it's just that Reuter should keep this money, and it's unjust. I would argue that this money should be taken away from Reuter under these circumstances when the undisputed evidence in front of this bankruptcy judge who said he imbued – he looked at the entire underlying record, which in Fegert the court said that the bankruptcy judge could do, and even Mr. Axelson's firm introduced this Vaughan affidavit that we relied on in the district court and that Judge Strand used to reverse the bankruptcy court and enter judgment in favor of Reuter. I would argue to the court that justice requires that the summary judgment in favor of Reuter be affirmed against the trustee's preference claim. Thank you, Your Honor. I think you're out of time, but we'll give you a minute. I would appreciate that. First, to answer Judge Rollins' question, Fegert does not expressly say that contract proceeds need to go to the debtor, but I do have the citation to the bankruptcy appellate panel decision where it says that, in fact, the proceeds did go to the debtor in that case. Therefore, it was not an issue before the Ninth Circuit, and the site is on page 14 of the opening brief, 88-BR-258-260. The next issue, Mr. Doody has taken the position that it was Reuter's lien against the contract proceeds to be released. That is a fatally flawed argument because under the Arizona Little Miller Act and the general acrylics decision by the Arizona Court of Appeals, Reuter had no lien rights against the contract proceeds or against the job. These were public works construction projects. That's the very reason why the Arizona Little Miller Act exists, is so that subcontractors such as Reuter and the other multitude of subcontractors cannot assert lien rights against public jobs. There were no lien rights that could be released by Reuter. The Fegert analysis- Or to analyze it like Fegert and say it was a surety's lien that was reduced. That's the correct analysis, but I merely wanted to point out that the- I understand. Thank you. Lastly, the argument has been made that Reuter should not be required to take the risk that a job may result in a loss. Reuter had absolutely no risk at all. These were bonded jobs. All Reuter had to do was go to the surety, go to the payment bond, and say, pay me. All these policy arguments about encouraging subcontractors to continue to work with troubled debtors, they simply don't apply in this situation because Reuter had absolute protection. All it had to do was go to the payment bond. Thank you. The case of J.W. Contracting v. Reuter is submitted.
judges: Ferguson, McKeown, Rawlinson